Filed 10/28/14  Umodified opinion attached
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STOP THE CASINO 101 COALITION et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>EDMUND G. BROWN, JR., as Governor, etc.,<br><br>     Defendant and Respondent. | A140203<br><br>(Sonoma County<br>Super. Ct. No. SCV-251712)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed herein on October 3, 2014, is modified as follows:

On page 4, footnote 2, add to the end of the paragraph "In view of our determination of other issues, we need not reach the coalitions' argument regarding application of the doctrine of judicial estoppel in this case" so that the footnote reads:

> 2 / The trial court also stated that in view of a petition for a writ of mandate that the coalition filed in October 2012 premised on the existence of the compact, unsuccessfully challenging alleged noncompliance with the California Environmental Quality Act, it appeared "that judicial estoppel should apply to [the coalition's] position in the instant action that Government Code section 12012.56 is invalid. In view of our determination of other issues, we need not reach the coalitions' argument regarding application of the doctrine of judicial estoppel in this case."

The petition for rehearing is denied. There is no change in the judgment.

Date:                  _____Acting P.J.

Counsel for Plaintiffs and Appellants:       SLOTE, LINKS & BOREMAN, LLP
Robert D. Links
Marglyn E. Paseka
Michael T. Healy
Bruce A. Mirolglio

Minh C. Tran, Napa County Counsel, for County of Napa, City of American Canyon, Napa County Farm Bureau, Napa Valley Grapegrowers, and Napa Valley Winegrowers as amicus curiae on behalf of plaintiffs and appellants.

Counsel for Defendant and Respondent:       Kamala D. Harris, Attorney General, Sara J. Drake, Senior Assistant Attorney General, William L. Williams, Jr., Deputy Attorney General.

Filed 10/3/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STOP THE CASINO 101 COALITION et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>EDMUND G. BROWN, JR., as Governor, etc.,<br><br>      Defendant and Respondent. | A140203<br><br>(Sonoma County<br>Super. Ct. No. SCV-251712) |

Stop the Casino 101 Coalition, an unincorporated citizen group, and three individuals (collectively, the coalition) appeal from a summary judgment rejecting their attempt to invalidate the compact between the state and the Federated Indians of the Graton Rancheria (the Graton Tribe) authorizing the operation of a gaming casino on a 254-acre parcel in and adjacent to the City of Rohnert Park. The coalition contends that because the State of California failed to explicitly cede to the Graton Tribe jurisdiction over the property, which was formerly held by private parties, federal law does not authorize the assumption of tribal jurisdiction over the property and therefore the state's entry into the compact violates the California constitutional provision authorizing such gaming compacts. The state contends that the coalition's claim is essentially an attack on the validity of action taken by the federal government that cannot be challenged in these state court proceedings, and that in all events there has been no violation of either federal or state law. We do not pass judgment on the contentious policy issues underlying the creation of Indian reservations for the purpose of constructing gaming casinos. We consider only the legal issues presented and conclude that the attack on the validity of the compact and on the legislation approving the compact fails for multiple reasons.

1

**Background**

The original Graton Rancheria was located on a 15.45-acre parcel near the town of Graton, some distance from Rohnert Park. In 2000, Congress passed the Graton Rancheria Restoration Act (the Graton Act), recognizing the Graton Tribe and making tribal members eligible "for all federal services and benefits furnished to federally recognized Indian tribes or their members." (25 U.S.C. § 1300n-2(c)(1).) The Graton Act provides that upon application by the Graton Tribe, the Secretary of the Interior "shall accept into trust for the benefit of the Tribe any real property located in Marin or Sonoma County, California, for the benefit of the Tribe after the property is conveyed or otherwise transferred to the Secretary." (25 U.S.C. § 1300n-3(a).) The Graton Act also provides that any real property taken into trust for the benefit of the Graton Tribe "shall be part of the Tribe's reservation." (25 U.S.C. § 1300n-3(c).) In May 2008, the federal Bureau of Indian Affairs published notice in the Federal Register of its intention to accept title to the casino site in trust for the Graton Indians. (73 Fed.Reg. 25766 (May 7, 2008).) In June 2008 the Graton Rancheria Tribal Council enacted the Graton Rancheria Gaming Ordinance and in August the Chairman of the National Indian Gaming Commission approved the ordinance "for gaming only on Indian lands, as defined in IGRA [the Indian Gaming Regulatory Act, 25 United States Code section 2701 et seq.], over which the Graton Rancheria exercises jurisdiction." In October 2010, title to the casino site was transferred to the United States in trust for the Graton Indians (from a subsidiary of a Nevada-based casino operator that had acquired title to the property in 2005). Attached to the grant deed was a document entitled "Acceptance of Conveyance" executed on behalf of the Secretary of the Interior by which the grant was "accepted by the United States of America pursuant to [Public Law] 106-568, the Graton Rancheria Restoration Act, 25 U.S.C. § 1300n-3." Following negotiations between the Graton Tribe and the state, in March 2012 the Governor and the tribal chair of the Graton Tribe executed the "Tribal-State Compact Between the State of California and the Federated Indians of Graton

2

Rancheria."[1] On May 17, 2012, the Governor signed into law Assembly Bill No. 517 ratifying the compact. (Gov. Code, § 12012.56.)

Litigation challenging creation of the casino predated entry of the compact. In 2008, following publication of the notice of the Secretary's intention to accept title to the casino site, an action was filed in federal court seeking a declaration that transfer of title would not confer on the Graton Tribe jurisdiction over the site. The action was dismissed by the district court and the dismissal affirmed by the Ninth Circuit on the ground that use of the land as a casino was then speculative and the plaintiffs lacked standing. (*Stop the Casino 101 Coalition v. Salazar* (9th Cir. 2010) 384 Fed.Appx. 546.)

The present action was commenced on May 21, 2012, before construction of the casino had begun. The coalition sought a temporary restraining order and a preliminary injunction to prevent construction but that relief was denied. Subsequently the coalition filed a second amended complaint, the first cause of action of which seeks a declaration that the statute approving the compact is invalid. The complaint alleges that the Graton Tribe does not have jurisdiction over the casino site so that the compact is not in compliance with IGRA, causing the statute to be out of compliance with the California Constitution. The court sustained the state's demurrer to the second amended complaint on the ground that the Secretary of the Interior and the Chairman of the National Indian Gaming Commission had not been joined. The coalition filed an amendment to the second amended complaint joining the two federal officials, who promptly filed a special

---

[1]	Among the many detailed provisions of this lengthy agreement, which authorizes the operation of up to 3,000 slot machines and banked and percentage card games, the compact grants the state gaming agency the right to inspect the gaming devices, the casino, and its records. Section 9.4 of the compact provides: "Nothing in this compact impairs the civil or criminal jurisdiction of the state under Public Law 280 (18 U.S.C. § 1162; 28 U.S.C. § 1360) or IGRA to the extent applicable. Except as provided below, all state and local law enforcement agencies and state courts shall exercise jurisdiction to enforce the state's criminal laws on the tribe's Indian lands, including the gaming facility and all related structures, in the same manner and to the same extent, and subject to the same restraints and limitations, imposed by the laws of the state and the United States, as is exercised by state and local law enforcement agencies and state courts elsewhere in the state, to the fullest extent permitted by decisions of the United States Supreme Court related to Public Law 280. The tribe hereby consents to such criminal jurisdiction. However, no gaming activity conducted by the tribe pursuant to this compact may be deemed to be a criminal violation of any law of the state. Except for such gaming activity conducted pursuant to this compact, criminal jurisdiction to enforce state gambling laws on the tribe's Indian lands, and to adjudicate alleged violations thereof, is hereby transferred to the state pursuant to 18 U.S.C. § 1166(d)."

appearance asserting that their joinder is precluded by federal sovereign immunity. The coalition then dismissed the secretary and the chairman from the suit.

Eventually the parties filed competing motions for summary judgment. In granting the state's motion and denying the coalition's motion, the trial court explained: "In expressly stating to this court that they do 'not challenge actions taken by federal officials or pursuant to federal law' and declining to further pursue available avenues of relief under federal law against appropriate federal defendants, who took the property into trust making it a part of the tribe's reservation, and approved the tribal gaming ordinance, plaintiffs effectively concede all of the elements necessary to establish the validity of the compact under federal law. [Citations.] [¶] The secretary's action in taking the property into trust on behalf of the tribe was in accordance with the express provision of the Graton Restoration Act, and the property's status as part of the tribe's reservation is expressly mandated by federal law. With the Tribe having been federally recognized pursuant to federal law, and the property being a part of the tribe's reservation under federal law, the property is eligible for class III gaming under IGRA. It follows that under IGRA, the tribe having had its gaming ordinance approved by the Chairman of the National Indian Gaming Commission, and hav[ing] negotiated the compact with the State of California that was duly ratified by the California State Legislature, class III gaming is permitted on the property under both federal law and the state Constitution. (Cal. Const., art. IV, § 19, subd. (f))." [2]

The coalition timely appealed from the judgment subsequently entered in favor of the Governor.

**Discussion**

Article 4, section 19, subdivision (e) of the California Constitution provides that "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." However, subdivision (f) of section 19,

---

[2] The trial court also stated that in view of a petition for a writ of mandate that the coalition filed in October 2012 premised on the existence of the compact, unsuccessfully challenging alleged noncompliance with the California Environmental Quality Act, it appeared "that judicial estoppel should apply to [the coalition's] position in the instant action that Government Code section 12012.56 is invalid."

4

added by Proposition 1A on the March 7, 2000 ballot, provides as follows: "Notwithstanding subdivision[] . . . (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of . . . banking and percentage card games by federally recognized Indian tribes on Indian lands in California *in accordance with federal law*. Accordingly, slot machines, . . . banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts." (Italics added.)

The coalition emphasizes the italicized reference to compliance with federal law, which law is to be found in IGRA, the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.). This statute provides: "Class III gaming activities shall be lawful on Indian lands only if such activities are— [¶] (A) authorized by an ordinance or resolution that— [¶] (i) is adopted by the governing body of the Indian tribe *having jurisdiction over such lands*, [¶] . . . and [¶] (iii) is approved by the Chairman." (25 U.S.C. § 2710(d)(1), italics added.)[3] The coalition argues that the transfer of title to the casino site to the United States in trust for the Graton Tribe did not confer *jurisdiction* over this site on the Graton Tribe, so that IGRA does not authorize gaming activities on that site and the California Constitution in turn does not permit the Governor to enter a compact authorizing gaming on that site.

The coalition argues that the transfer to the federal government of title to property is not the equivalent of a transfer of jurisdiction. As a general proposition, this is correct. (See, e.g., *Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512,

---

[3] The statute further provides that such gaming activities are lawful only if "(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and [¶] (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." (25 U.S.C. § 2710(d)(1).)

The statute also provides that "Any Tribal-State compact . . . may include provisions relating to—[¶] (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; [¶] (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations." (25 U.S.C. § 2710(d)(3)(C)(i)-( ii).)

The purposes of IGRA include providing "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (25 U.S.C. § 2702(1); see generally, *Artichoke Joe's v. Norton* (E.D.Cal. 2002) 216 F.Supp.2d 1084, 1091-1094.)

1520.) Relying on *Coso Energy Developers,* the coalition argues that jurisdiction over property within a state can be acquired by the United States in only three ways: purchase or donation of property with the consent of the state, reservation of jurisdiction on admission of the state to the union, and a state's cession of jurisdiction with the acceptance of the United States. (See *ibid.*) Clearly neither of the first two methods apply and, the coalition argues, neither does the third. The coalition contrasts the Graton Act statutory language, which provides only that real property taken into trust for the benefit of the tribe "shall be part of the tribe's reservation," with the statute authorizing land to be taken into trust for the Pokagon Band of Potawatomi Indians, which provides: "The Band shall have jurisdiction to the full extent allowed by law over all lands taken into trust for the benefit of the Band by the Secretary." (25 U.S.C. § 1300j-7.) Since the Graton Act does not explicitly state that the Graton Tribe shall acquire jurisdiction, the coalition argues that although the United States has acquired title to the casino site in trust for the benefit of the Graton Tribe, the Graton Tribe has not acquired jurisdiction over the site.

There are numerous fallacies in the coalition's argument. As pointed out above, the Chairman of the National Indian Gaming Commission has approved the Graton Tribe's gaming ordinance under IGRA for gaming "on Indian lands, as defined in IGRA, over which the Graton Rancheria exercises jurisdiction." The coalition's theory rests on the premise that the chairman incorrectly determined that the Graton Tribe exercises jurisdiction within its reservation. The chairman is not a party to these proceedings and this court would be in no position to set aside his determination even if we disagreed with it. Moreover, his determination clearly is correct.

The coalition does not challenge the ability of Congress to authorize the recognition of an Indian tribe and the acceptance of land in trust for the tribe as the tribe's reservation. (U.S. Const., art. I, § 8, cl. 3; *Carcieri v. Kempthorne* (1st Cir. 2007) 497 F.3d 15, 39, revd. on other grounds *sub nom. Carcieri v. Salazar* (2009) 555 U.S. 379.)[4]

---

[4] This premise has been challenged in an amicus curiae brief filed on behalf of the County of Napa, City of American Canyon, Napa County Farm Bureau, Napa Valley Grapegrowers, and Napa Valley Winegrowers. Relying

That, in short, is what the Graton Act has done. Recognition of an Indian reservation necessarily confers a degree of jurisdiction on the affected Indian tribe. Federally recognized Indian tribes are " 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." (*Big Horn County Electric Cooperative, Inc. v. Adams* (2000) 219 F.3d 944, 954.) "The [Supreme] Court has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' [citation], and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.' " (*California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 207.) While many cases question the extent to which Congress has authorized states to exercise limited jurisdiction over Indian lands (e.g., *ibid*.), none casts doubt on the fundamental principle that a federally recognized tribe exercises jurisdiction over its reservation (e.g., *Nevada v. Hicks* (2001) 533 U.S. 353, 361 ["Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation"]). "The cases in [the United States Supreme] Court have consistently guarded the authority of Indian governments over their reservations." (*Williams v. Lee* (1959) 358 U.S. 217, 223.)

"IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." (*Artichoke Joe's v. Norton, supra,* 216 F.Supp.2d at p. 1092.) Federal regulation provides explicitly that "none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be

largely on its interpretation of article IV, section 3 of the United States Constitution, which guarantees "state territorial integrity" (*Garcia v. San Antonio Metropolitan Transit Authority* (1985) 469 U.S. 528, 550), the amicus brief argues that Congress has no authority to take property located within a state, in trust for Indians or otherwise, without the consent of the state (except as authorized by the Enclaves Clause, discussed below, or the power of eminent domain). The thrust of this argument is that the Graton Act itself is unconstitutional. Recognizing that this court has no power to declare an act of Congress unconstitutional, the coalition has steadfastly maintained that it does not question the validity of the Graton Act. We do not comment on the reasons for which the amicus brief argues that the Indian Commerce Clause (U.S. Const. art. I, § 8, cl. 3) has been misinterpreted to confer on Congress plenary power to legislate in the field of Indian affairs, but proceed on the premise, as does the coalition and as we must, that the Graton Act is within the constitutional authority of Congress.

applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States. . . ." (25 C.F.R. § 1.4(a).)[5]

The suggestion that a tribe does not necessarily exercise some jurisdiction over its reservation is at odds with "traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." (*California v. Cabazon Band of Mission Indians, supra,* 480 U.S. at p. 216.) Indeed, the amicus curiae brief submitted in support of the coalition's position acknowledges "It is beyond dispute that the federal government's acquisition of lands for Indians whether authorized by a tribe-specific congressional act or [25 United States Code] section 465 establishes 'Indian country' and thereby diminishes the fundamental jurisdictional rights of states and their political subdivisions."[6]

Thus, in *City of Roseville v. Norton* (D.D.C. 2002) 219 F.Supp.2d 130, a federal district court rejected a challenge to the Secretary of the Interior's taking land into trust on behalf of the United Auburn Indian Community with the intention of permitting the tribe to open a gaming casino. By legislation comparable to the Graton Act, Congress had recognized the status of the tribe as an Indian tribe and authorized the secretary to accept land in Placer County in trust for the benefit of the tribe, without explicitly stating that it

---

[5]     The regulation permits the Secretary of the Interior to make exceptions in specific cases (25 C.F.R. § 1.4(b)) but no party suggests the applicability of any exception in the present case.

[6]     "Indian country" is defined in 18 United States Code section 1151 to include "any Indian reservation under the jurisdiction of the United States Government." IGRA defines "Indian lands" as "(A) all lands within the limits of any Indian reservation; and [¶] (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or . . . over which an Indian tribe exercises governmental power." (25 U.S.C. § 2703(4).)

The amicus brief cites a number of additional cases reflecting the basic proposition that an Indian tribe has jurisdiction over its reservation: *South Dakota v. United States DOI* (8th Cir. 2012) 665 F.3d 986, 990 ["States generally lack authority to regulate Indian tribes and tribe members on trust property."]; *Yankton Sioux Tribe v. Podhradsky* (8th Cir. S.D. 2010) 606 F.3d 994, 1006 ["Indian country falls under the primary civil, criminal, and regulatory jurisdiction of the federal government and the resident Tribe rather than the states."]; *United States v. Roberts* (10th Cir. 1999) 185 F.3d 1125, 1131 ["lands owned by the federal government in trust for Indian tribes are Indian country pursuant to 18 U.S.C. § 1151"]; *Narragansett Indian Tribe v. Narragansett Elec. Co.* (1st Cir. 1996) 89 F.3d 908, 920 ["Taking land in trust is a considered evaluation and acceptance of responsibility indicative that the federal government has 'set aside' the lands."].

was thereby conferring jurisdiction on the tribe. (*Id.* at p. 135; 25 U.S.C. § 1300l-2.) Like the Graton Act, the Auburn Indian Restoration Act provided that property taken in the name of the United States in trust for the tribe "shall be part of the Tribe's reservation." (25 U.S.C. § 1300l-2(c).) The court rejected a multitude of arguments as to why the secretary had no constitutional authority to take such action (*City of Roseville,* pp. 149-156) and why the action violated IGRA (*id.* at pp. 156-164). Although the petitioners in that case did not make precisely the same arguments as the coalition makes here, the decision clearly recognizes that acceptance by the federal government of land in trust for an Indian tribe thereby confers jurisdiction on the tribe over the resulting reservation.

One of the arguments rejected by the court in *City of Roseville v. Norton, supra,* 219 F.Supp.2d 130 is that the Enclaves Clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 17)[7] prohibits the assumption of federal jurisdiction without the consent of the state in which the property is situated. The court pointed out that this clause applies only to federal acquisition of exclusive jurisdiction, and that "[j]urisdiction over Indian lands . . . is not exclusive, and requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.' " (*City of Roseville,* p. 150.) The "assertion that the Enclaves Clause stands for the proposition that 'before land can be removed from the primary sovereignty of a state, the legislature of the impacted state must grant its consent to such a removal' . . . is simply incorrect." (*Ibid.*) Although the coalition now disavows reliance on the Enclaves Clause, *Coso Energy Developers v. County of Inyo, supra,* 122 Cal.App.4th 1512, on which the coalition heavily relies, was addressing only the means by which the federal government may obtain *exclusive* jurisdiction over land within a state.[8] That

---

[7]     This clause authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

[8]     Contrary to counsel's statement at oral argument, other cases cited in *Coso Energy Developers* and in the coalition's brief were also referring to the means of obtaining exclusive federal jurisdiction. (E.g., *Silas Mason Co. v. Tax Commission of Washington* (1937) 302 U.S. 186, 210 ["exclusive legislative authority would be obtained by the United States only through cession by the State"]; *Surplus Trading Co. v. Cook* (1930) 281 U.S. 647, 652-656.)

9

decision says nothing about the means by which jurisdiction that is not exclusive of federal or state jurisdiction may be acquired by an Indian tribe.

Although, as the coalition points out, the federal statute recognizing the Pokagon Band of Potawatomi Indians contains language explicitly conferring jurisdiction on the tribe, the Governor correctly responds that the statutes recognizing other tribes are in this respect almost identical to the Graton Act. (25 U.S.C. §§ 1300k-4(d), 1300l-2(c), 1300m-3-(b); cf. 25 U.S.C. §§ 1300g-4(a)-(b), 1300h-5(a), 1300i-(b), (c)(1).) These other statutes also contain no explicit reference to jurisdiction, but that they do confer jurisdiction on the respective tribes (albeit limited or concurrent with respect to jurisdiction over certain matters reserved to the federal or state governments) appears to be beyond question.

Finally, even if—contrary to all of the foregoing—the coalition were correct that jurisdiction over the land transferred to the United States in trust for the Graton Tribe could not be conferred on the tribe without the express consent of the state, such consent is implicit in the compact signed by the Governor and ratified by the Legislature. Although the compact is not a formal "cession" of jurisdiction as that term has been used, the compact, signed by the Governor and ratified by the Legislature, recognizes and consents to the exercise of jurisdiction by the Graton Tribe in conformity with the terms of that agreement. The recitals to the compact refer explicitly to the exchange of benefits "on a sovereign-to-sovereign basis," to the need "to promote strong tribal government and self-sufficiency," and to the "joint sovereign interest" of the tribe and the state. A recital confirms that "this compact will afford the tribe primary responsibility over the regulation of its gaming facility." The compact provisions referred to in footnote 1, *ante,* while containing the tribe's consent to the retention of broad jurisdiction by the state, preclude the state from prohibiting gaming activity authorized by the compact. The acknowledgement of the tribe's jurisdiction in this manner is consistent with the provisions of Government Code section 110, which provides that the extent of the state's jurisdiction "over places that have been or may be ceded to, purchased, or condemned by

the United States is qualified by the terms of the cession or the laws under which the purchase or condemnation is made."[9]

In all events, the premise of the coalition's argument fails. By virtue of the Graton Act, the Graton Tribe acquired jurisdiction over its reservation in conformity with IGRA. Therefore, the compact between California and the Graton Tribe was "in conformance with federal law" and consistent with article 4, section 19, subdivision (f) of the California Constitution.

## Disposition

The judgment is affirmed.[10]

_____
Pollak, Acting P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.

---

[9] While the 254-acre site was not "purchased" by the United States, we see no reason why this provision should not be read to encompass property gifted to the federal government.

[10] The coalition's several requests for judicial notice are denied, as the materials to which the requests refer are irrelevant or unnecessary to resolution of the issues on appeal.

11

Counsel for Plaintiffs and Appellants:     SLOTE, LINKS & BOREMAN, LLP
Robert D. Links
Marglyn E. Paseka
Michael T. Healy
Bruce A. Mirolglio

Minh C. Tran, Napa County Counsel, for County of Napa, City of American Canyon, Napa County Farm Bureau, Napa Valley Grapegrowers, and Napa Valley Winegrowers as amicus curiae on behalf of plaintiffs and appellants.

Counsel for Defendant and Respondent:     Kamala D. Harris, Attorney General, Sara J. Drake, Senior Assistant Attorney General, William L. Williams, Jr., Deputy Attorney General.